852 F.2d 1287
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Allan HULL, Executor of the Estate of Elizabeth A. Hull,
Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 87-3661.
 United States Court of Appeals, Sixth Circuit.
 Aug. 2, 1988.
 
 Before WELLFORD and ALAN E. NORRIS, Circuit Judges, and JULIAN A. COOK, Jr., District Judge.*
 PER CURIAM.
 
 
 1
 Allan Hull, Executor of the Estate of Elizabeth A. Hull, appeals from the summary judgment granted the government in his suit to recover $46,731.56 in federal estate tax which he contended he was required to pay due to an excess valuation placed by the government on stock owned by the estate.
 
 
 2
 Included in the estate of plaintiff's decedent were 17,600 shares of Greif Bros. Corporation stock. The mean price of Greif stock, as reflected by sales on the Midwest Stock Exchange as of the August 6, 1980 alternate valuation date, was $21.875 per share. That figure was based upon the average high and low prices of the stock sold on August 5 and August 7; there were no sales on August 6. Upon the advice of Matthew J. Hickey, a broker who actively traded Greif Bros. stock, plaintiff argued that the mean price was not the fair market value of the stock, since sale of so large a block of stock would have depressed its market value. Accordingly, the estate claimed a thirty percent "blockage" discount, and listed a fair market value of $15.23 per share on the estate tax return. The Internal Revenue Service disallowed the discount and assessed a deficiency. The estate paid the deficiency and brought this suit for refund.
 
 
 3
 The government moved for summary judgment on the ground that plaintiff was unable to prove that the stock could not be sold within a reasonable time without depressing its market price. The summary judgment evidence before the district court included letters from Hickey as well as his deposition and affidavit, statistical data, and a report prepared for the IRS by a financial analyst. The district court focused its attention on the materials from Hickey, and concluded that he was "far from persuasive"; that his opinion did "not withstand ... cross examination"; that "little credibility" was due his opinion; and that he made contradictory statements, "discrediting him as an expert witness."
 
 
 4
 Summary judgment is proper when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party points out to the court the absence of evidence on an essential element of the cause of action, the burden shifts to the non-moving party to present evidence indicating the existence of a genuine issue of material fact as to that element. In order for a dispute of fact to be genuine, the non-movant must produce sufficient evidence to allow a reasonable jury to return a verdict for him. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The evidence must be viewed in the light most favorable to the non-moving party. The court may not weigh the evidence or try the credibility of witnesses, but it may assess whether the evidence is "merely colorable" or "not significantly probative." Anderson, 477 U.S. at 249.
 
 
 5
 Generally, the value of stock for estate tax purposes is the fair market value on the date of valuation. Treas.Reg. Sec. 20.2031-2(a). Because market value can be adversely affected by the sale at one time of a large block of stock, the actual fair market value of stock may be lower than market quotations. Accordingly, a taxpayer will be entitled to a lower valuation if he can establish that a block of stock "could not be liquidated in a reasonable time without depressing the market."[1]
 
 
 6
 The only question before the district court was whether plaintiff's summary judgment evidence created a genuine issue of material fact about whether the block of stock was so large in relation to actual sales in the market that it could not have been liquidated in a reasonable time without depressing the market.
 
 The government's analyst concluded that:
 
 7
 In view of the trading volume on the Midwest Stock Exchange ... the subject holding was precluded from sale in a regular manner due to the size of the block relative to the trading volume....
 
 
 8
 Considering the fact that the number of shares were deterred from a regular sale due to block size, the conventional method of disposition would have been a transaction using procedures of a non-registered secondary offering.
 
 
 9
 ... In most instances brokers and investment bankers act as principals--purchasing securities from the seller at some discount from the going market price, and reoffering the securities to the public at a price in line with the market.
 
 
 10
 He concluded that the discounted value of the stock in such a transaction would be $21 per share. He also noted that during the first seven months of 1980, in only two of those months did the total volume of monthly sales of Greif stock exceed the number of shares held in the estate's block of stock.
 
 
 11
 The essence of Hickey's expert opinion is found in his letter of July 6, 1981:
 
 
 12
 As a consequence, in my opinion, because of the nature of the market for Greif A shares in the spring and summer of 1980, the pressure of a large block of in excess of 17,000 shares would undoubtedly depress the market--and perhaps even could not be disposed of entirely, except over a long period of time.
 
 
 13
 In the course of Hickey's deposition, the government's counsel repeatedly sought to have Hickey estimate with precision the amount of time that would be required to dispose of the entire block of stock on the stock exchange, without depressing the market price. When he asserted his inability to do so due to the small amounts of that stock which were being traded on the market during 1980 and other factors, counsel repeatedly instructed him to "guess." It was this guessing upon which the district court relied as the basis for its conclusion that Hickey's statements were inconsistent.
 
 
 14
 In contrast to the opinion of the government's expert, Hickey did not believe the block of stock was large enough to be successfully sold in a secondary offering, and that if that method of sale were attempted, it would, in his opinion, require a discount in excess of thirty percent to purchasing brokers.
 
 
 15
 The point of plaintiff's lawsuit was that the mean price of Greif stock on August 6, arrived at by consulting market quotations, was not the fair market value of the stock held by the estate. All the evidence on that point agreed with plaintiff; there was no evidence to support the government's valuation of $21.875 per share.
 
 
 16
 Both experts agreed that the size of the block of stock precluded its sale in the regular market without depressing the market. There was a conflict of opinion between the two experts concerning the best way to arrive at an accurate indication of value for the stock--the government's expert thought the fair market value would best be reflected through a secondary offering, Hickey by sales of small numbers of shares over a long enough period of time that the market price would not be depressed. Hickey repeatedly said he was unable to give an opinion of how long that would require. The government's expert did not express an opinion concerning the time required to sell the stock in the regular market without depressing its price.
 
 
 17
 Plaintiff was entitled to the favorable inferences arising from Hickey's testimony. Because plaintiff was required to prove a negative proposition, it reasonably may be inferred from Hickey's saying it was not possible to estimate the amount of time required with any accuracy, that it was probable the stock could not be liquidated in a reasonable time without depressing the market price. And from the opinion of the government's expert that the stock "was precluded from sale in a regular manner," his silence on the time required to sell the stock on the stock exchange without depressing its price, and his opinion that a secondary offering was the best method of liquidating the stock, one can infer that the block of stock was so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market.
 
 
 18
 Because the summary judgment evidence was uncontroverted that the fair market value of the estate's stock was not the mean price derived from stock exchange quotations on the date of valuation, and a genuine issue of material fact existed as to the actual fair market value of the stock, the cause was not ripe for summary judgment, and the judgment of the district court is reversed, and this cause is remanded for further proceedings.
 
 
 
 *
 The Honorable Julian A. Cook, Jr., United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Treas.Reg. Sec. 20.2031-2(e) provides:
 In certain exceptional cases, the size of the block of stock to be valued in relation to the number of shares changing hands in sales may be relevant in determining whether selling prices reflect the fair market value of the block of stock to be valued. If the executor can show that the block of stock to be valued is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations.